Thank you, everyone, for your patience. Please be seated. The final case on calendar for argument today is Singh v. Nat'l R.R. Passenger Corp. Good morning, Your Honors. Counsel, may it please the Court. Good morning. My name is David Klachek. I represent the appellates in this matter, and I would request two minutes' time for rebuttal. All right. This case concerns an Amtrak railway grade crossing at Dusterberry Way in Fremont, California. My clients are the decedents, Amarjeet Singh's four children, grown children, and spouse, Balwinder Kaur. Counsel, regardless of the outcome of this case, please convey the condolences of the Court to the family of the decedent. Thank you, Your Honor. I certainly will do that. The case, the issues before the Court concern the issues of summary judgment that the Court granted. This is a negligence claim against the defendants. Negligence was argued in the lower court, and the lower court made a series of errors. We believe the salient errors were all related to summary judgment and can be reviewed de novo. There are a few issues that are reviewed for abuse of discretion, but those are periphery issues, and we can discuss those later. The first and, in my mind, the most important issue before this court is the lower court's finding relating to the California Public Utilities Commission as it relates to their authority to dictate, I guess as the defendants are saying, railroad grade crossings. Well, so isn't the argument that the urban crossings require pedestrian gates more appropriately raised before the PUC itself? No, Your Honor. The PUC specifically gives authority and directs the railroads for the responsibilities of maintaining and updating. Had there been any problems in that area? What does the record show? My review of the record is that they hadn't had any problems there. The record is devoid in regard to that either way. Well, I mean, that would help. And then apparently, I mean, the tragedy, I mean, it's a truly tragic situation, and both for your clients and also for someone that would have to see this happening. It's horrible. But that being said, the appellant walked this way every day, right? Yes, Your Honor. That is correct. And so, and there's a school nearby, and there have been no problems with the nearby school or anything along those lines. Your Honor, there's no evidence either way. And it's my understanding that there had been problems and this grade. If there's no evidence, we have to go by evidence. So how can we say that there are problems? Well, there's no evidence in the record of problems or no problems. But to have something that's more than what the Public Utility Commission requires, don't you have to show that there's been something at this intersection that would have required more? No, Your Honor. The issue of whether there is a duty is well settled in California under Hogue. Hogue is the 1969 California Supreme Court ruling, which was an issue very much like this. In Hogue, Route 99 crossed a railroad crossing. And in Hogue, the individual truck driver, who was also the decedent, was, in fact, hard of hearing. So we've got some similarities there. And in Hogue, the argument was you didn't install a warning, a visible warning, that indicated the train was coming. You relied only on the horns. But this individual could not hear, so it's a question for the jury of whether they could have done more. And the Hogue court specifically stated that the CPUC is a minimum standard and that it is for the jury to determine if they can do more. And the CP and the Hogue court specifically discussed General Order 75, which is that issue in this case. So the appellees are going to argue that 1201 and 1202 of the Public Utilities Code give sole authority to the CPUC. 1201 and 1202 were passed in 1951. The Hogue decision was in 1969. We've had the Romo decision, which is an appellate court decision from California, which further supported Hogue that said the CPU is a minimum standard and that there can be more done. The CPU's own General Orders, yes, Your Honor? I was going to say, so what, in your view, what was the duty in this case? The duty in this case was to install a pedestrian gate. This is in Fremont, California. Your Honors, if I could point you to the record at 580. What imposed that duty? What imposed the duty to install pedestrian gates in your view? Was it a regulation? Was it a case authority? What imposed that duty to install pedestrian gates? Several things, Your Honor. Number one, the common law duty in Hogue and in Romo. That's good law today. Number two, General Order number 88, which is that ---- Don't you have to show that this intersects? There has to be some evidence in the record that this intersection is more dangerous than other railroad intersections in the state. And the record's devoid of any problems at this particular intersection or whatever. That is not the standard, Your Honor. The standard is whether there's a duty for this particular railroad to put in a pedestrian gate or other pedestrian warnings. Is it common for there to be pedestrian gates at railroad crossings? It's very common, Your Honors. Where is the record? Where can we go in the record to confirm that it's common to install pedestrian gates, that that's the state of the development in this area? The California Manual on Uniform Traffic Control Devices, which begins in the record at 99. And if you go to ---- And you said General Order 88? Well, General Order 88 says it's the responsibility of the railroad to determine the appropriateness of the crossings. So you think that creates a duty? That creates a duty according to Hogue. Does that create a duty to install pedestrian gates? In this case, it creates a duty to install pedestrian gates. If you look at the record on page 117, the California Manual on Uniform Traffic Control Devices has already determined that pedestrian gates are pre-approved. Yeah, but that doesn't mean that there's a duty to install them just because they're pre-approved. If that were a duty, then there would have to be pedestrian gates at every railroad crossing. In this case, it's a minimum standard that they did not meet, that the CPUSC has said pedestrian gates are totally appropriate, General Order 88. But saying that it's appropriate doesn't mean that it's mandated. Well, in Hogue, it's a question for the jury, and that's the law in the state of California. I want to clarify when you refer to the railroad. Yes, Your Honor. Whether you're referring to Amtrak, Union Pacific, or both, because there's evidence in the record that Amtrak, while they do some patrolling of the tracks, doesn't have any control over the intersection. Your Honor, that's another issue. With regard to when I say railroad, I am referring to both. However, we have two entities. We have Union Pacific, which has been admitted by the appellees to own the railroad tracks. So there's no issue as to ownership. Right. I think it's clear that Union Pacific has the obligations for the safety that's on the ground or that's not on the train, let's say. They own the railroad tracks. They own the tracks. They own the gates. They own the flashing lights. If there were a pedestrian gate, they would own that. And General Order 88 goes to that that says it's the railroad's responsibility to put in these gates. But how does Amtrak have liability for the lack of a pedestrian gate when they don't control or own the right-of-way? Well, control is different from ownership. And it's custody, control, and ownership, which is California law for premises liability. And in our view, there's evidence for the jury to hear whether Amtrak controlled the premises sufficient to give way to liability. So in this case, Amtrak ran several trains a day. This is the Capitol Corridor train. This is in an extremely busy neighborhood in Fremont, California, with a lot of pedestrians, and they ran their trains up to 80 miles an hour in this area. There seems to be some, and this is a delicate question, but there seems to be some evidence in the record that the appellant may have just laid down on the tracks, and there was a witness that said that, just. So what do we do with that? Well, Your Honor, that's. I mean, if someone goes and puts themselves intentionally in front of a train, and there does seem to be some evidence of that, although it's just, it's there, how would any of this have made a difference? Well, that wasn't an issue brought up by the appellees in this case. However, I will say. Well, no one, like, really wants to say that, but it does seem to be. There was a witness that said that, I think to your investigator, that it looked like the appellant just wanted to, you know, and there was a description of what the appellant did before the train hit him. If I may, Your Honor, this train was traveling at 69 miles an hour. We have the declaration of Dr. Huang who said this individual was legally blind. He couldn't see more than 10 feet. He was walking a route he walked every single day. The witness, Mr. Greenlee, submitted a declaration that said this happened in a matter of seconds. Mr. Niadek, the engineer, said this happened in a matter of seconds. Imagine a blind person trying to time his walk so that he could walk exactly on the tracks and get hit by the train traveling at 69 miles an hour at the exact correct moment. It is inconceivable that he could do this. There's no evidence. But he did it every day. And on this day when it happened, then they said that he just, he did something, and he bowed down on the tracks and put himself in front of the tracks. Your Honor, the horn was not sounding as the train was approaching that intersection, according to Mr. Greenlee. Mr. Singh was walking, and he hears nothing. He's legally blind. All of a sudden, with two seconds to spare. But we don't know what Mr. Singh heard or didn't hear. Well, you know what Mr. Greenlee heard. That's different. So Mr. Greenlee. He was in the car, right? He was in the car right there. And we give him all the inferences for summary judgment. And a jury could certainly find that the horn wasn't sounded beforehand. No, the jury could find that he didn't hear it. But they could also find that the. I mean, when you're in a car, being in a car is different from being on the track. You have windows rolled up or down. You have music playing or not. You have, you know, the focus on something else. So I don't know that that's necessarily an inference that because he didn't hear it that the horn wasn't blowing. Well, I believe that it is an inference that this court should make in a summary judgment motion. All of these are issues of fact that the jury can make the determination on. But for summary judgment, the court should be looking at the facts in a light most favorable to the plaintiff. Why were the eyewitnesses not deposed? Well, Your Honor, we had taken their recorded statements. That's not good enough, though, necessarily. The court didn't think it was good enough because it's not under oath at that point. It's not under oath, but it would have been admissible if they had been subpoenaed, because either they would have, A, said the same thing that they said on the recording. You don't subpoena people for summary judgment. You can, Your Honor. No, you don't have a hearing. No, that's not the way it happens. We requested that the court either allow us to take their depositions. We got one person. Well, no, but all of us have done summary judgments, and summary judgments are not a trial. Everything is submitted together, and if you have deposition testimony or whatever you have, but you don't call witnesses in a summary judgment motion. I see my time is up, Your Honor. I would say we do have the declaration of Mr. Greenlee. And if there's no other questions, I would like to reserve the rest of my time. When you come back, I'd like to talk with you about the facts of whole, because it appears that there was a problem in there that was being that the court was concerned with as opposed to this case where there's no record of a problem. Very good, Your Honor. Okay. Thank you, Your Honor. Please, the court. William Belane for the defendants' appellees Amtrak and UP and Mr. Nydak, the engineer. So are you arguing the whole time, or is someone else arguing too? I'm going to be doing the arguments. Okay. Yeah, thank you. Let me quickly touch on the point that Judge Callahan mentioned in terms of whether there's any causation, really, where the evidence presents any causation. And the judge, among other things, did conclude that there was insufficient evidence to demonstrate causation. And, of course, in summary judgment, what the defendants are allowed to do is say to the plaintiffs, you can't show an element of your proof. And, in fact, I don't think they ever specifically addressed what was sort of the elephant in the room, because you're quite right, nobody really wanted to talk about the implications of their pain. No causation that it wouldn't have made a bit of difference. And the testimony was, among other things, there was a testimony from the engineer, who said that he saw the man slowly approaching, turn 90 degrees, and crouch down just before the accident happened. We understand that he's legally blind, but he wasn't deaf. And for 22 seconds, there was the gates and the bells coming down, 22 seconds. For 11 seconds, we submit the undisputed evidence shows that there was a horn blaring at him. Counsel, what's your response to opposing counsel's observation that at least one witness said that he didn't hear the horns, and that raises an inference that the horns weren't sounded appropriately? What's your response? I guess all we know to say is that at crossings, you try to have multiple ways of giving warnings to people. This is a gentleman who not only went there daily, he went there twice a day. And I don't think we know for how long, but we know he lived in that area since 2010. So it may have been five years of this. But I guess why doesn't it create a triable issue? If someone said, I didn't hear a horn, why doesn't that create a triable issue? He said, I didn't hear a horn, or I don't recall hearing a horn. And the question is whether that's enough by itself. The judge found that that's not enough. We submit that's not enough. Why? Because you have not just the testimony of somebody else. Okay. If the engineer testifies to having blown the thing, and the conductor also testifies to having blown the horn, that's good. I'd like to say that maybe that's enough by itself. But I don't have to, because we have the event data recorder. That's why it is there. And that event data recorder shows that, actually, the horn, taken together with the testimony of the engineer, shows that, in fact, a horn was started to sound 11 seconds before, which is exactly where the whistle post is and where you're supposed to start blowing the horn as a preventive measure. The other piece of this is ‑‑ Well, there's something, too, though, about, like, I don't know, long ones and then little short ones. Right. Yeah, yeah, yeah. And I think from the recording, you can't tell about the short ones. And so if you don't do everything exactly like it sets out, is that negligence per se, or what's the story there? What the evidence shows is that they went right after the incident, they went and did a functionality test to show the police. And the functionality test was consistent with what we say happened. And that's as follows. The EDR ‑‑ and, by the way, the EDR is at 363, if you actually want to look at it. It's like a graph. And there are columns. And in the middle, there's two columns. One says B-L-L, and the other says H-R-N. At first, I couldn't figure out where the heck it was, but one is supposed to be for the bell, and one is supposed to be for the horn. In fact, consistently, what the EDR showed in this case was starting just about 11 seconds before you get to the intersection, the bell is shown as a positive consistently. The horn doesn't show anything. And so what was explained to people was that's this EDR, that's the way it works. But what happens is once you press or pull a lever, I'm not sure which it was in this case, in order to activate the horn, it automatically activates the bell, and only the bell shows up for a period of time until the bell is deactivated. And they did that in a test. You don't activate the bell. You activate the horn, which activates the bell. Automatically starts the bell. And in this particular EDR, I mean, I wish it were more perfect than this, but this is the way it was. Only the bell shows as being activated. In fact, it never shows there being a horn, whereas obviously even the appellant said, yeah, there was a horn, but there wasn't a horn starting at about 1,100 feet. So by doing the functionality test, it also confirmed for the police, and we say for the experts who had offered admissible testimony, that, yeah, when you pull the horn, all that happens is a bell starts to show up, and that bell won't stop showing up until it is separately deactivated. So you ask yourself, why in the world would this gentleman be only activating the bells? It doesn't make any sense. What makes complete sense is, and it's consistent with his testimony, and that's not unimportant, it's very important, that the expert looked at the engineer's testimony, because after all, sometimes their testimony can be inconsistent with what shows up in the EDR. And you've got a problem. In this case, it was entirely consistent with his testimony as to when he started with the horns. And it can't be surprising that somebody who's minding his own business in a car at an intersection, thinking it's just another day, who, just like that, is witnessing a horrible, terrible tragedy. So would your argument be that in light of all of this evidence, including the EDR and the consistent statements, that a declaration that says, I don't remember hearing, is substantial evidence that could defeat summary judgment? Exactly. The most the other side has is scintilla as opposed to substantial. That's precisely the argument. As opposed to what Appellant's asking is that we draw an inference that if he doesn't remember hearing it, maybe it's because it didn't happen. Which wouldn't be surprising under the circumstances and where he was in the car. So let me briefly touch on the whole business of jurisdiction over UP or whether the PUC has exclusive jurisdiction. What we ask you to do is to read those general orders. And I think that's going to tell you all you need to know, that regardless of whether or not you've got various forms of pedestrian gate crossings that may be approved by them, that doesn't mean by the PUC, I'm sorry. That's exactly what I mean. That just because you have that doesn't mean that you can act unilaterally. When you look at GO75 in all of its various forms, when you look at 88 in both of its two forms, you will see that they clearly say in the end, the PUC, we're going to approve this. Or we're not going to approve it. But you're not going to be able to use it until we approve it. And just as an aside, it's not unsurprising that it's that way. Because every crossing is different. And what you get out of the mud cap is you get basically a toolbox, which tells you a variety of protections that you can use. And they may all work, but it depends on the crossing. And the PUC retains the authority clearly to say in the end, this is the particular set of tools that you're going to use at this crossing. So what do we make of a case that says that the Public Utility Commission creates the minimum standard? Oh, we're not troubled by it in this particular instance. That implies that the railroad might have an obligation to do more than what is minimum. Well, the whole point here is the case law says you can't frustrate or interfere with the policy of the PUC. The policy of the PUC is they get to decide in the end, here's what you're going to put up. But what if it came to your attention that there were all sorts of accidents in this area and children were wandering on the tracks or that there's been all sorts of close calls or any of those things? Are you saying you would have no duty that the PUC is? We wouldn't have a duty if we were able to show that as of the time somebody raises all this or there's an accident, that as of that time, what we had up was something that was approved, which doesn't necessarily happen, by the way. You can get approval for one form and then somebody goes there and says, well, wait a minute. You actually didn't have that particular device in. But what if this record were different and there were lots and the railroad and Amtrak, they were aware of a lot of instances of problems? Wouldn't you have to call that to the attention of the PUC or something? I don't know whether there's a regulation that says you have to call it to attention. What we do know is that the PUC is frequently involved. Sometimes it's sua sponte for no reason. Sometimes it is precisely because there is an accident that occurs and will cause them to come in and look not necessarily even at that crossing. It may even look more broad. But let's just assume for argument's sake that there could, under some instance, be some sort of duty on your clients. What does this record have? Yeah, there's nothing that would show a duty in this event. I mean, I think you, Judge Callahan, I think you asked some questions earlier of my colleague on that issue. There's no indication that there was ever any problem with the pedestrian at the crossing, nor is there any indication that at any point in time the PUC or anybody, anybody, because frankly just about anybody can file a petition with the PUC under I think it's 1702, 1702. You look at how broad it is. There are tons of people. It's not just the railroad that can raise a question about whether the crossing is safe. There's nothing in this case suggesting an issue was ever raised by anybody. So there was also the issue of the children recovering non-economic damages, and I believe that the district court said that there was, there just wasn't anything there and counsel tried to file an amended judgment after that? Or what, how, from your perspective, what do we do about that? We think that they had the opportunity. We raised the issue of damages in support of summary judgment. In opposition, they didn't say a thing. We did put in a record that shows that two of the children are adult children who are outside the country. The third adult one actually supported his father, and there was no evidence whatsoever about the mother. And I think the judge quite properly under the circumstances said, you know what, you're out. There's clearly no evidence of pecuniary damage. Obviously because there's a wife here, we'll allow her, assuming the case goes forward, if there's any case at all, we'd allow her to try to cover non-economic damages. Although I must say there should be an issue here, which you don't have to get into I don't believe, over disclosures. And if you never make a disclosure over non-economic damages, because it's not something you can easily calculate, does that prevent you from then a trial going into the issue of non-economic damages? Just as a matter of interest, you know, there are actually some case law out there, and it does tend to say that if you intend to go to the jury and ask for a specific amount, then you have to have put something in the initial disclosures. But some of the cases say that if you don't have that, okay, we'll still allow you to put in a case, or just basically go to the jury and say it's for you to decide based on the facts we've given you here. Unless the Court has any other questions, I'll rest on our brief. All right.  Thank you, Your Honors. Real quick before I get into Hogue. Page 580 of the record. This is the CPUC General Order 88. The railroad shall be responsible for the physical construction of additional warning devices or any changes in the existing warning devices at the crossing. The railroad shall be responsible for it. That's what the CPUC General Order 88 says. The CPUC has put the responsibility on the railroad. It is not the CPUC's responsibility to go from grade crossing to grade crossing and say, this is fine, this is fine, this is fine. It's for the railroad who is operating and profiting. What triggers that obligation? That's the duty part of it, and that's why I ask you to look at Hogue, because there were particular circumstances in Hogue that triggered the responsibility to put additional signals there because there was a problem with seeing the particular crossing location where the accident occurred. There were some signal lights there, but not enough signal lights, and there had been a demonstrated problem. We don't have that in this case. The demonstrated problem we have here is we don't have a pedestrian crossing. But the demonstrated problem in Hogue was they, even the managers of the location were saying that there was a blind spot. Your Honor. The drivers could not see the northeasterly location. Whatever the location was, was a blind spot. And, therefore, that was the problem that was known by the railroad, and that's what constituted the duty because there was a problem, there was a duty to correct the known problem. And we don't have that here. Your Honor, if I may. Please. It wasn't a known problem. There was evidence before the court that they could only see 91 feet.  That was not a problem that was determined to be known by the railroad. That was a problem that was demonstrated to the jury. The jurors actually went out to the railroad crossing and looked at the railroad crossing. The railroad also argued in that case that all the other bells and whistles, the horns, and everything from the railroad should have warned this individual. The Hogue court said it is well settled that such statutory regulations, and they examined General Order 75, such statutory regulations constitute only the minimum measure of care required by the railroad and is usually a matter for the jury to determine whether something more than the minimum is required. Hogue, there was testimony from the defendant's assistant signal supervisor and from its principal assistant signal engineer that the proximity of Highway 99 to the railroad tracks posed a problem, that in addition to the difficulty Highway 99 southbound traffic waiting to turn left would have been seeing the lights. So there was a problem designated that was known, and we don't have that here. Well, Your Honor, the last point I would like to make, you are correct on the Hogue, and I apologize, but the last point I would like to make is to look at the EDR data, and the EDR data may be consistent with the horn being sounded, but it is not supportive of the horn being sounded. There's no EDR data relating to the horn. The EDR data only shows whether either the horn or the bell was sounded. Once either the horn or the bell is sounded, then the bell continuously rings until it is turned off. It doesn't mean that the horn is sounding. So I would just ask Your Honors to look at the evidence in the light most favorable to the appellant. I thank you for your time. Thank you, counsel. Thank you, both counsel. The case is submitted for decision by the court. That completes our calendar for the morning. We are on recess until 930 a.m. tomorrow morning. All rise.
judges: Rawlinson, Callahan, Bolton